**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| VEROOT, LLC, *et al.,* | ) | CASE NO. 1:26-CV-00013 |
| | ) | |
| Plaintiffs, | ) | |
| | ) | JUDGE J. PHILIP CALABRESE |
| vs. | ) | |
| | ) | |
| PAGEFOLIO, INC., *et al.,* | ) | **JURY DEMAND ENDORSED HEREON** |
| | ) | |
| Defendants. | ) | |

**FIRST AMENDED COMPLAINT**

Now come Plaintiffs Veroot, LLC ("Veroot") and Delivered, Inc. ("Delivered," and with Veroot, the "Veroot Parties") for their First Amended Complaint against Defendants Pagefolio, Inc. ("Pagefolio") and Timothy Leigh Richman ("Richman," and with Pagefolio, the "Richman Parties") ("Amended Complaint"), and aver as follows:

**INTRODUCTION**

1.     Leigh Richman is a disgruntled former C-level employee of the Veroot Parties who decided to depart the companies of his own accord in July 2025. The Veroot Parties accepted Mr. Richman's planned resignation. Little did they know that Mr. Richman was concocting a fraudulent scheme to falsely claim that he owns the Veroot Parties' intellectual property ("IP"), and that he was purging the companies' records of evidence belying his false claim.

2.     Over his almost 13-year tenure, the Veroot Parties paid Mr. Richman millions of dollars to serve as their Chief Technology Officer ("CTO"). In that role, Mr. Richman performed numerous functions, including overseeing and serving as administrator of the Veroot Parties' IT systems, performing bug fixes, patches, and other software development projects, and supervising software engineering employees in both the United States and Canada. Mr. Richman also

participated in nearly all the Veroot Parties' critical executive meetings, referred to as L10 meetings, giving him firsthand access to the Veroot Parties' business strategies and trade secrets.

3.     On December 24, 2025, *for the first time* in his almost 13 years of employment with the Veroot Parties, Mr. Richman claimed that he owns, among other things, "the majority of the platform used by Veroot."  (*See* December 24, 2025 Letter, a true and accurate copy of which is attached as **EXHIBIT A** (the "December 24 Letter"), Doc 36-1.)  Not once in the almost 13 years he worked for the Veroot Parties did Mr. Richman ever claim that he or his pass-through tax-shelter Pagefolio had an ownership interest in any of the Veroot Parties' IP.

4.     Since filing the Complaint (Doc. 1) on January 2, 2026, however, the Veroot Parties have investigated these issues in conjunction with a third-party software provider, which revealed that Mr. Richman laid the groundwork for his sham IP ownership claim months before his attorneys sent the December 24 Letter.

5.     Specifically, the Veroot Parties have uncovered smoking gun evidence that, in furtherance of his fraudulent IP ownership claim, Mr. Richman spoliated key documents, including logs of the original codebase and Mr. Richman's executions of various company policies, such as an express IP transfer agreement.  Mr. Richman's intentional spoliation is directly actionable under Ohio law.  Mr. Richman spoliated these critical documents between July 2025, when he gave his notice, and December 24, 2025, the date his attorneys sent the demand letter.  Indeed, Mr. Richman testified during the January 30, 2026, hearing that, by July 31, 2025, he planned to seek legal advice regarding his relationship with the Veroot Parties.  Even though he kept working with the Veroot Parties after that, he kept that fact secret.  Only one conclusion can be drawn from this timeline: Mr. Richman plotted to make his fraudulent IP ownership claim months ago, he never

spoke a word about it to the Veroot Parties, and he intentionally deleted material documents contradicting his false ownership claim.

6. This spoliation may just be the tip of the iceberg, as the Veroot Parties' investigation is ongoing. As CTO of both Veroot and Delivered, Mr. Richman served as systems administrator of both companies with admin-level control over their systems, including the codebase, emails, Microsoft 365, SecureFrame ISO Platform, Notion, Slack messages, and other forms of electronic data. This dispute has thus morphed from a narrow IP ownership dispute into a full-scale investigation into a former high-ranking employee's criminal theft, destruction, and unauthorized use of company property, as well as his wrongful disclosures to and fraudulent filings with the U.S. Copyright Office.

7. Accordingly, in addition to the Veroot Parties' original (1) declaratory judgment claim, they now bring claims for (2) copyright invalidity, (3) declaratory judgment – fraud on the U.S. Copyright Office, (4) common law fraud, (5) intentional spoliation of evidence, (6) violation of R.C. 2307.60, damages resulting from a criminal act, (7) breach of fiduciary duty, (8) tortious interference, (9 & 10) trade secret misappropriation (DTSA and Ohio), and (11) breach of contract.

8. Mr. Richman's fraudulent scheme included, but was not limited to, his failure to disclose his alleged IP ownership claim, his failure to complete projects he promised to complete in 2025 before transitioning out of the companies, during which time Mr. Richman acted as faithless servant, his spoliation of key evidence, and his intentional exclusion of the Veroot Parties from their own systems. Mr. Richman also breached his fiduciary duties to the Veroot Parties through these actions. Mr. Richman already admitted this last point under oath during the January 30, 2026 hearing, confessing that, after the Veroot Parties filed this action, he intentionally revoked

the Veroot Parties' access to Veroot's Amazon Web Services Account ("AWS Account"), which

he admitted Veroot solely owns and pays for:

```
        So you admitted that Veroot owned and paid for the AWS
accounts, correct?
A    Yes.
Q    And Pagefolio also admitted that Veroot owned and paid
for the AWS accounts, correct?
A    Yes.
Q    So there's no dispute on who owns those accounts?
A    No.
Q    All right.
     There's also no dispute, Mr. Richman, that you removed
access for certain users on those accounts, correct?
A    Yes.
Q    And you did that after the complaint in this matter
was filed, correct?
A    Yes.
```

(Doc. 32, Transcript of January 30, 2026 Hearing at 244:10–24, a true and accurate copy of which

is attached here as **EXHIBIT B** ("Hearing Transcript"), Doc. 36-2.)

9.      As a software company, Veroot's AWS Account is the lifeblood of its business,

providing transportation and logistics clients with indispensable solutions for a number of critical

functions and generating millions of dollars of annual revenue.  Mr. Richman removed Veroot's

access to the very AWS Account that holds the codebase for the products Veroot provides to

customers.  Mr. Richman's revocation of that access prevented Veroot's owners, managers, and

employees from accessing the codebase, onboarding new employees, and making critical

-4-

engineering updates.  At bottom, Mr. Richman's actions severely restricted Veroot's ability to serve its customers, costing them at a minimum hundreds of thousands of dollars in lost revenue, diverted resources, attorneys' fees, and lost time resulting from this tortious act alone.

10.     Mr. Richman must face consequences for this intentional tortious act.  As CTO of both Veroot and Delivered, Mr. Richman owed fiduciary duties to both companies, including the duty of loyalty.  Mr. Richman's claim that he solely owns the Veroot Parties' IP, despite never once in almost 13 years of employment disclosing that he believed he owned it, breached his duty of loyalty to the Veroot Parties.  If Mr. Richman believed that he or Pagefolio owned the Veroot Parties' IP, he had a duty to disclose that to the Veroot Parties.  Instead of proceeding in good faith and in the Veroot Parties' best interests, Mr. Richman acted in his own self-interest all along, attempting to arrogate to himself IP and accounts the Veroot Parties have always owned. Additionally, Mr. Richman's failure to complete his outstanding projects before transitioning out of the companies has already resulted in millions of dollars of additional spend and potentially lost revenue and enterprise value, for which the Richman Parties are responsible.

11.     Mr. Richman also admitted during the January 30, 2026 hearing that he had "mutual trust" with the Veroot Parties, demonstrating that the parties shared the special trust and confidence of a fiduciary relationship as opposed to an arms-length vendor/vendee relationship:

```
Q       Would it be fair to say that the parties operated with
mutual trust?
A       Yes.
```

(Ex. B., Hearing Transcript, 182:5–7.)

12.     Additionally, by holding hostage the Veroot Parties' systems and IP, the Richman Parties have tortiously interfered with the Veroot Parties' customer relationships, employee

relationships, and other business relationships.  Mr. Richman also breached his contracts with the Veroot Parties, whether express or implied, by claiming that he owns IP that the parties always intended to be made for hire for the Veroot Parties and by disclosing the Veroot Parties' confidential information to the U.S. Copyright Office.

13.     During his employment, Mr. Richman chose to be paid as an independent contractor solely because he believed it was advantageous to his personal income tax situation in Canada.  Indeed, Mr. Richman never objected to Veroot and Delivered holding him out as their CTO.  Delivered's website currently lists Mr. Richman as CTO, a title he never disavowed or disclaimed before this case:



**Leigh Richman**
Chief Technology Officer

*See* Welcome to Delivered, available at https://delivered.com/about-delivered (last accessed February 18, 2026).

14.     Also during his employment, Mr. Richman assented to certain agreements and policies expressly stating that any projects or work product he created for Veroot or Delivered was on a "work for hire" basis and belonged to the companies alone.  Further, Mr. Richman agreed that any works he created for either company were in exchange for his salary and any other compensation the Veroot Parties paid him, which was significant.

15.     Neither the facts, the law, nor common sense support Mr. Richman's fanciful claim that he owns essentially all the Veroot Parties' IP.  Mr. Richman worked exclusively for the Veroot

Parties during the relevant time period; the Veroot Parties paid all Pagefolio's expenses, including Pagefolio's rent and wages for its employees; and the Veroot Parties provided Mr. Richman with substantial benefits, including hardware and software allowances, phone and data allowances, paid time off, bonuses, profit sharing, payments for insurance and legal fees, and ability to work from home, among other things.  Critically, all the alleged IP Mr. Richman claims he and Pagefolio own was built and serviced on the Veroot Parties' systems, for which the Veroot Parties developed the core system, logic, foundational architecture, and product work long before Mr. Richman's employment began.

16.     Nevertheless, as a result of the December 24 Letter, the Richman Parties have created a substantial controversy over the ownership of the Veroot Parties' IP.  The Veroot Parties thus bring this action to establish that they solely own the IP they have used in their businesses for the last 15 years and to recover damages for the tortious acts and breaches the Richman Parties committed in furtherance of their wrongful assertions of IP ownership.

17.     Further, on January 23, 2026—three weeks after the Veroot Parties filed this action—the Richman Parties doubled down on their error in claiming ownership over the Veroot Parties' IP when they made false and fraudulent filings with the U.S. Copyright Office.  Accordingly, in addition to the existing declaratory judgment action and the tort actions described above, the Veroot Parties have no choice but to bring additional claims for copyright invalidity, declaratory judgment – fraud on the U.S. Copyright Office, and trade secret misappropriation, for Pagefolio's wrongful disclosures of the Veroot Parties' trade secrets to that office.

**THE PARTIES**

18.     Veroot is an Ohio limited liability company with its principal place of business at 13000 Darice Parkway, Strongsville, Ohio 44149.  Veroot has two members, Andrew Hurst, an individual citizen of Ohio, and Joe Hurst, an individual citizen of Arizona.

19.     Delivered is a Delaware corporation with its principal place of business at 13000 Darice Parkway, Strongsville, Ohio 44149.

20.     Pagefolio is an Ontario, Canada corporation with its principal place of business at 470 Albertus Avenue, Peterborough, Ontario K9J 6A2 Canada.

21.     Richman is an individual citizen of Ontario, Canada residing at 470 Albertus Avenue, Peterborough, Canada K9J 6A2 or 561 King Street, Peterborough, Ontario K9J 2T4 Canada.

**JURISDICTION AND VENUE**

22.     This Court has original diversity jurisdiction over this matter under 28 U.S.C. § 1332(a)(2) because Veroot and Delivered are domiciled in Ohio, Pagefolio and Richman are citizens or subjects of a foreign state, Canada, and the amount in controversy exceeds seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

23.     This Court also has original subject-matter jurisdiction over this action under 28 U.S.C. § 1338(a) (copyrights), and 28 U.S.C. § 2201(a) (Declaratory Judgment Act).

24.     The Court has personal jurisdiction over Pagefolio and Richman under O.R.C. § 2307.382(A)(1), (2), and (6) because they transact business in Ohio, they perform services for Ohio-based companies, a substantial part of the events giving rise to the Complaint took place in Ohio, and the Richman Parties committed torts outside Ohio that caused injury within the state of Ohio.  In addition, Richman has traveled to Cleveland, Ohio for business during the course of his relationship with Veroot and Delivered.

25.     Under 28 U.S.C. § 1391(b)(2), the United States District Court for the Northern District of Ohio is the appropriate venue for this matter because it is the federal judicial district in which a substantial part of the events or omissions giving rise to Veroot's and Delivered's claims

occurred.  Veroot's and Delivered's claims arise out of Richman's and Pagefolio's performance of services on behalf of Veroot and Delivered in Ohio.

<strong><u>FACTUAL BACKGROUND</u></strong>

<u>Veroot and Delivered</u>

26.     The Veroot Parties are in the logistics and parcel shipping industries and provide compliance software, consulting services, and parcel shipping services to clients both nationwide and internationally.

27.     Both Veroot and Delivered are headquartered in the Cleveland, Ohio metropolitan area.

28.     Andrew Hurst ("Andrew"), the founder and Chief Executive Officer at both Veroot and Delivered, initially developed Veroot in or around 2010.

29.     Andrew, along with another colleague, built the initial version of the Veroot software platform.

30.     The Veroot software platform is comprised of two main types of software. The first is Veroot's Transportation Security Administration ("TSA") Software which helps automate TSA Compliance for Indirect Air Carriers to allow them to comply with the TSA Indirect Air Carrier Standard Security Program and 49 C.F.R. 1520 Regulations.  Veroot's TSA Software generates the majority of the company's annual revenue.  The second is Veroot's CTPAT Software which helps companies automate regulatory maintenance requirements for the Customers and Border Protection's CTPAT program management project.  Taken together, Veroot's different types of software are described as the "Veroot Platform."

31.     The complete Veroot Platform, which qualifies as a trade secret under Ohio law, includes the following:

a.      source code, modules, services, and architectural implementations;

-9-

b.      compliance-specific workflow orchestration logic tailored to TSA, CTPAT, DOT, and related regulatory frameworks;

c.      proprietary compliance methodologies, training models, and decision frameworks Veroot has developed exclusively;

d.      Veroot's proprietary network mapping architecture and underlying datasets, such as relationships, risk indicators, and operational intelligence;

e.      the government program policy management engine, including rule structures, policy logic, and automated enforcement mechanisms unique to Veroot;

f.      deployment pipelines, infrastructure architecture, environment configurations, and security control frameworks used to build, secure, and operate the platform;

g.      historical code repositories, version histories, and development records reflecting the evolution and implementation of Veroot's technology;

h.      customer configuration data, system implementations, and operational workflow designs created for and within the Veroot platform; and

i.      internal technical documentation, system credentials, authentication mechanisms, and encryption implementations protecting platform integrity and access.

32.      These specific components of the Veroot Platform are not available to the general public and Veroot closely guards them.  Veroot keeps such information strictly confidential in order to maintain a competitive advantage over competitors.

33.      Veroot also undertakes reasonable measures to ensure that its confidential information and trade secrets remain secret by, among other things, only permitting certain employees with access to its code base and other necessary data, making known to those individuals the fact that the information was to be kept confidential, maintaining reasonable security in and around its place of business, and requiring individual employees to agree to keep it confidential.

34.      The Veroot Platform has economic value to Veroot because, if disclosed to a competitor of Veroot or used to compete directly with Veroot, competitors could divert business away from Veroot.

35.     Veroot's software is hosted on the AWS Account that Andrew created. Veroot maintains, pays, and solely owns this AWS account, which the Richman Parties do not dispute.

36.     From its creation to January 2026, Andrew maintained admin access to Veroot's AWS account.

37.     Veroot also maintains other core company systems to maintain, fix, and develop Veroot's Platform including, but not limited to, EC2 infrastructure, development and deployment tools, virtual private networks ("VPNs"), domain name system ("DNS") controls, email servers, and full production databases.

38.     Since the company's inception, all infrastructure supporting Veroot's platform has been registered under Veroot-controlled domain names, which Veroot has solely owned and paid for.

39.     Joe Hurst ("Joe"), Veroot's other member, also joined the company after Andrew started it and was responsible for hiring sales and customer service personnel.  Over the years, Veroot expanded its customer base through trade show participation and outreach, ultimately achieving profitability.  At that time, Veroot supported approximately 100 Indirect Air Carrier ("IAC") customers and thousands of agents who paid monthly software-as-a-service ("SaaS") subscription fees.  This growth enabled Veroot to expand its workforce to approximately nine employees, including additional sales and customer service personnel.

40.     During this period, Andrew performed development work on Veroot's systems, including, but not limited to, by building enhancements, fixing defects, importing data, and maintaining system functionality.

41.     Veroot also hired a new independent contractor to migrate the system architecture to a cloud-based environment and to develop the foundational Vendor Management product. This product enabled customers to add non-TSA vendors to the platform and to monitor Department of Transportation compliance data.

42.     Veroot continued to expand its customer base and became the de facto standard for TSA compliance software within the industry.  By this time, which was well before either Pagefolio or Richman were involved, all major components of the TSA product had been developed, including the IAC and Agent portals, Compliance Manager, E-Training, and the base Vendor Management portal.

43.     At present, Veroot's software serves over 900 Indirect Air Carriers, over 4700 Agents, as well as over 100 Importers.

44.     Andrew developed and created Delivered in 2022.

45.     Delivered also has its own software that helps companies arrange for the shipment of packages from a pickup location to a destination location.  Taken together, Delivered's different types of software are described as the "Delivered Platform."

46.     The Delivered Platform, which qualifies as a trade secret under Ohio law, includes the following:

   a.     the complete Delivered shipping, rating, and carrier-networks software platform, including all source code, system architecture, integrations, and service modules;

   b.     proprietary intelligent routing algorithms, optimization logic, and decisioning models used to determine carrier selection, service levels, transit performance, and cost efficiency;

   c.     capacity management frameworks, allocation logic, and operational control workflows governing carrier utilization, load balancing, and network performance;

   d.     end-to-end operational workflows and process orchestration, including shipment ingestion, labeling, tracking, exception handling, billing, and settlement logic;

e. carrier integrations, pricing structures, rate logic, and commercial configuration methodologies unique to Delivered's Platform and network relationships;

f. deployment pipelines, infrastructure architecture, environment configurations, and security control systems used to build, operate, and safeguard the Delivered Platform; and

g. internal technical documentation, system credentials, authentication controls, and encryption mechanism protecting platform access, integrity, and security.

47. These specific components of the Delivered Platform are not available to the general public and Delivered closely guards them. Delivered keeps such information strictly confidential in order to maintain a competitive advantage over competitors.

48. Delivered also undertakes reasonable measures to ensure that its confidential information and trade secrets remain secret by, among other things, only permitting certain employees with access to its code base and other necessary data, making known to those individuals the fact that the information was to be kept confidential, maintaining reasonable security in and around its place of business, and requiring individual employees to agree to keep it confidential.

49. Delivered's software has economic value to Delivered because, if disclosed to a competitor of Delivered or used to compete directly with Delivered, competitors could divert business away from Delivered.

50. Delivered has a robust customer base that uses its software and network to move packages around the country and has shipped over 200,000 packages from 2024–2026.

<u>Richman's Employment With Veroot and Delivered</u>

51. In 2013, Jason Brumwell, an affiliate of Andrew's, introduced Richman to Veroot.

52. In July 2013, Veroot officially engaged Richman as an employee of Veroot. On or about June 24, 2013, Veroot presented Richman with a Confidential Information and Invention

Assignment Agreement (the "Confidentiality Agreement").  A true and accurate copy of the Confidentiality Agreement is attached as **EXHIBIT C**, Doc. 36-3.

53.     Section 4(d) of the Confidentiality Agreement states that Veroot owns any copyrightable work Richman solely or jointly authored for Veroot:

> (d)     **Assignment of Company Inventions.**  I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all Company Inventions.  I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary and any other compensation paid by the Company to me, including without limitation in equity interest in the Company offered to me..  I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions.

(*Id.*)

54.     Section 3(a) of that agreement also prohibits Veroot employees from using or disclosing Veroot's confidential information:

> 3.     **Confidential Information**
>
> (a)     **Protection of Information.**  I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information (as defined below) that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.  I further agree not to make copies of such Confidential Information except as authorized by the Company.

(*Id.*)

55.     Section 4(c) of the Confidentiality Agreement defines "Company Invention" as "any and all Inventions that [Richman] may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship." (*Id.*)

-14-

56.     While Richman did not sign the Confidentiality Agreement at that time, he did not formally reject the Confidentiality Agreement or expressly refuse to sign it. Further, Richman began to perform his duties as Veroot's employee, accepting the terms of the Confidentiality Agreement through his performance.

57.     Initially, Veroot paid Richman directly. However, due to his Canadian residency, Richman requested to be paid as an independent contractor, referring to himself as a "1099 Employee," instead of a W-2 employee, because he believed that would provide certain tax advantages for him:

> **Leigh Richman**                                September 2, 2013 9:34 PM
>
> I sat with the accountants last Friday and discussed the taxation questions I had.
>
> The easiest solution for both Veroot and I is for me to give you 12 invoices at the end of the year equivalent to my income and route it through my own sole proprietorship. There's no additional taxes for you (the HST is zero rated) and you can expense it however you wish while I can take care of the taxes in my own jurisdiction. To our governments the entire transaction is from business to business and that keeps things simple.
>
> If you want to reword any of the contracts to state "contractor" (or my business name) instead of "employee" to satisfy the IRS we should do that (I have no idea if that's required or if the "1099 Employee" classification makes that a moot point).

(Exhibit D, a true and accurate copy of Mr. Richman's September 2, 2013 email to Veroot, Doc. 36-4).

58.     Mr. Richman also admitted during the January 30, 2026 hearing that a U.S-based company could not directly hire a Canadian citizen, so even if Veroot had wanted to pay him as a W-2 employee, it could not have:

-15-

```
Q      And you testified that a U.S.-based company cannot
directly hire a Canadian citizen, correct?
A      That is my understanding.
Q      All right.
       So even if Veroot had wanted to hire you as an
employee, it could not have been done it, based on your
understanding, correct?
A      That is correct.
```

(Ex. B, Doc. 36-2, Hearing Transcript at 245:16–23.)

59.     As a result, while Richman operated as a Veroot employee, Veroot paid him through his company Pagefolio.

60.     Upon information and belief, Richman started Pagefolio as a sole proprietorship in 2013. Upon information and belief, in 2014 Richman registered Pagefolio as a closely-held Canadian corporation.

61.     Upon information and belief, Richman conducts essentially no other business through Pagefolio, because Veroot, Delivered, and Richman intended for his services to be exclusive to those companies.

62.     Veroot unilaterally set Richman's salary each year. At no point did Richman ever try to negotiate his salary at Veroot. Veroot also periodically paid Richman year-end bonuses. Starting around 2023, Richman also received a 2% profit share from Veroot as part of his compensation.

63.     Veroot paid Richman's salary to Pagefolio on a monthly or bimonthly basis. Any other components of Richman's compensation were also paid to him through Pagefolio.

64.     Veroot initially tasked Richman with maintaining the existing TSA product.  At the time, Richman had limited experience with GitHub, cloud-based systems, and Veroot's framework, and required extensive on-the-job training.  His responsibilities included ensuring system scalability, addressing technical debt, stabilizing AWS deployments, and maintaining database and application performance.

65.     While Richman focused on maintaining the TSA product, Joe conceptualized, designed, and expanded functionality for the Vendor Management product.  Joe personally developed core functionality, including systems for file storage, form creation and distribution, form data management, contact management, incident tracking, and information field management.  This included the design and implementation of class-based and action-based widgets enabling dynamic form behavior.  These components still constitute the foundation of Veroot's Vendor Management and CTPAT products.

66.     Andrew and Joe at all times directed, supervised, and approved Richman's work because they possessed the regulatory expertise and customer insights necessary to define system requirements.  All feature requests, specifications, and changes were documented in Veroot's JetBrains change management system.  Pagefolio implemented features at Veroot's direction but did not contribute independently conceived intellectual property.

67.     Features that Richman implemented at Veroot's direction included, but were not limited to, improved data import functionality; the "persona system" for transitioning IAC employees to agents; a JavaScript-based form-building tool for Vendor Management; and the TSA tool known as ExpressSync.  Veroot personnel defined, tested, and validated these features.  Additionally, Joe conceived product concepts, including enhancements to the training system and a feature known as EasySTA.

68. Pagefolio's work primarily involved system maintenance, performance optimization, remediation of technical debt, infrastructure scaling, bug fixes, UI improvements, and implementation of features that Veroot leadership designed. Pagefolio also assisted in deploying AWS infrastructure at scale, including redundancy and architectural layout, all of which Veroot owned, registered, and paid for.

69. Veroot named Richman Veroot's CTO in 2014.

70. After working with Veroot for some time, Richman requested Veroot hire additional employees in Canada to assist him in his work for Veroot.

71. Veroot eventually hired three individuals to work with Richman in Canada, including two software engineers, Arin Blue and Ricardo Bandala, and an administrative assistant for Richman, Laura Wilson.

72. Veroot unilaterally set Blue's, Bandala's, and Wilson's salaries and paid them through Pagefolio, similar to its arrangement with Richman.

73. Richman also secured office space in Canada for Veroot's Canadian team.

74. Richman referred to Pagefolio as "Veroot North."

75. Andrew started Delivered in 2022. At that time, Andrew invited Richman to work for Delivered. At that time, Veroot and Delivered executed a contract, under which any intellectual property Veroot created for Delivered was expressly assigned to Delivered. Such contract would have included assignment to Delivered of any intellectual property that Richman may have assisted in creating during that time period. Eventually, Richman became Delivered's CTO under a similar compensation-for-services arrangement.

76. Veroot reimbursed Richman for all expenses related to his work with Veroot and Delivered including, but not limited to, rent for office space in Canada, Pagefolio legal expenses,

equipment and technology, Pagefolio's Starlink services, and SaaS software subscriptions, among others.

77.     Richman never provided the Veroot Parties with any proposals or other documents outlining the scope of work for any projects he completed for the Veroot Parties.

78.     At all times during the Richman Parties' work for the Veroot Parties, the Veroot Parties controlled the manner and means by which the Richman Parties carried out their job duties, including assigning projects for the Richman Parties to complete.

79.     Throughout his employment with the Veroot Parties, Richman participated in phone calls and meetings with the Veroot Parties' employees regarding his work for the companies, including regularly participating in meetings of the management teams.

80.     As CTO of Veroot and Delivered, Richman directly supervised Veroot and Delivered employees.

81.     Further, as CTO of Veroot and Delivered, Richman attended all executive level meetings for both companies.

82.     During the January 30, 2026 hearing, Andrew Hurst confirmed that Richman attended all the Veroot Parties L10 meetings:

```
A       We didn't have a board at Veroot, and the -- his
participation as a chief technology officer did bring him
into executive meetings, which we call like our L10
meetings, which are strategy meetings.  He participated in
all of those as our CTO.
```

(Ex. B, Doc. 36-2, Hearing Transcript 74:13–17.)

83.     Richman participated in employee interviews at both Veroot and Delivered and helped onboard new employees for both companies.

-19-

84. At all times during Richman Parties' work for the Veroot Parties, the Veroot Parties provided the Richman Parties with all instrumentalities and tools required for the Richman Parties to carry out their job duties.

85. Critically, not once in Richman's nearly 13 years of employment with the Veroot Parties did he ever claim ownership over any portion of the Veroot Parties' codebase, intellectual property, or infrastructure. Richman never asserted that any code or systems were excluded from work-for-hire.

86. During his tenure with the Veroot Parties, Richman received multiple compensation increases. Since July 2013, the Veroot Parties paid Pagefolio at least $3 million in connection with Richman's employment.

<u>Richman Expressly Agrees to the IP Transfer and Confidentiality Agreement</u>

87. In early 2025, the Veroot began working to obtain ISO 27001 compliance. ISO 27001 compliance is a certification that notifies buyers, suppliers, and vendors in the logistics industry that a given company develops and manages its code and servers in a reliable, secure way. To obtain ISO 27001 Compliance, a company is required to participate in various internal and external audits.

88. Secureframe, Inc. ("Secureframe") is a vendor that participates in the collection, collation, and management of a company's data so it may seamlessly participate in compliance audits.

89. Veroot contracted with Secureframe to assist with its ISO 27001 compliance efforts.

90. To obtain ISO 27001 compliance, a company's employees must acknowledge and accept certain policies as well as participate in specific training exercises.

91. Veroot's Secureframe platform facilitated its employees' acceptance of those policies and participation in training sessions.

92. One of the policies Veroot employees were required to acknowledge and agree to was the "Internal NDA Agreement," a true and accurate copy of which is attached as **EXHIBIT E**, Doc. 36-5.

93. The terms of the Internal NDA Agreement are identical to the Confidentiality Agreement Veroot presented Richman in 2013.

94. The Internal NDA Agreement also states that Veroot owns any copyrightable work a Veroot employee solely or jointly authors for Veroot:

> d. **Assignment of Company Inventions**. I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all Company Inventions and all patent, copyright, trademark, trade secret and other intellectual property rights therein. I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary. Any assignment of Company Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "Moral Rights"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

(*Id.*, Section 4(d).)

95. Section 3(a) of the Internal NDA Agreement also required that employees refrain from disclosing or using any company confidential information:

3. **Confidential Information**.

   a. **Protection of Information**. I understand that during the Relationship, the Company intends to provide me with information, including Confidential Information (as defined below), without which I would not be able to perform my duties to the Company. I agree, at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform my obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information that I obtain, access or create during the term of the Relationship, whether or not during working hours, until such Confidential Information becomes publicly and widely known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved. I further agree not to make copies of such Confidential Information except as authorized by the Company.

(*Id.*)

96.    Richman was listed as a Veroot employee in the Secureframe platform and thus was required to acknowledge and accept the Internal NDA Policy.

97.    Richman acknowledged and accepted the Internal NDA Policy on May 27, 2025, as did his executive assistant, Laura Wilson.

Richman Becomes A Faithless Servant

98.    Starting by July 31, 2025, at the latest, Richman became derelict in his duties for both Veroot and Delivered.  Throughout his last year working for the Veroot Parties, Richman continuously missed deadlines and failed to fulfill his commitments to the Veroot Parties' customers, owners, investors, and other stakeholders.

99.    For example, Richman committed to finalizing his portions of Delivered's Parcellant platform by April 2025. Richman failed to meet that deadline.

-22-

100. Richman also committed to developing and deploying his portions of Delivered's DMIS software by April 2025 as well. Richman failed to meet that deadline.

101. Richman also promised to develop and deploy his portions of Veroot's "Easy STA" program by March 2025. Richman failed to meet that deadline.

102. By delaying completion of these systems, Richman caused Veroot and Delivered to lose revenue from these additional systems.

103. Richman's failure to keep deadlines also resulted in reputational harm to both Veroot and Delivered.

104. On July 31, 2025, after expressing disagreement with certain business decisions, Richman told the Veroot Parties that he wanted to sever ties by the end of 2025.  He claimed that he would ensure a professional transition and assist in resolving outstanding matters. Again, Richman never claimed that he had any ownership interest in any of the Veroot Parties' intellectual property.

105. With respect to his comment that he would "resolve outstanding matters," Richman later confirmed that this related to what were, in his opinion, complicated legal questions to resolve regarding the Veroot Parties' code.  But Richman never disclosed to the Veroot Parties at that time that he thought the parties had complicated legal questions to resolve.

106. At the January 30, 2026 hearing, Richman confirmed that on or around July 31, 2025, he planned to retain legal counsel regarding those "complicated legal questions":

```
Q     And then that last little bit you say, you just -- you
don't give a definition of "outstanding matters."  What did
you mean by "outstanding matters"?
A     I understood that we had some very complicated legal
questions to resolve with regard to the code, but I needed
advice, and so I needed to seek that advice before I
commented on it.
Q     And did you retain legal counsel for that advice?
A     I did.
```

(Ex. B, Doc. 36-2, Hearing Transcript at 189:4–12.)

107.    Accordingly, as early as July 31, 2025, Richman viewed himself and Pagefolio as legally adverse to the Veroot Parties.

108.    Despite this, Richman failed to disclose that to the Veroot Parties.

109.    Further, while continuing to work for the Veroot Parties, Richman began taking steps to misappropriate the Veroot Parties' property without ever informing the Veroot Parties that he believed he owned the Veroot Parties' IP.

110.    Following Richman's notice, Andrew and Joe attempted to work with Richman to ensure an orderly transition of Richman's work responsibilities to a new CTO, which Richman promised to do on July 31, 2025.

111.    Richman did not assist Andrew and Joe in coordinating an orderly transition plan.

112.    In December 2025, Veroot hired a new Vice President of Engineering to assume Richman's responsibilities at Veroot. Delivered also hired a new Vice President of Engineering to assume Richman's responsibilities at Delivered.

-24-

113.    On December 24, 2025, Christmas Eve and one week before Richman initially planned to exit the companies, Richman's lawyer sent a letter to the Veroot Parties claiming that Pagefolio owned the following intellectual properties:

> Without attempting to catalogue intellectual property assets in this letter, Pagefolio's position is that it owns, among other things:
>
> - the majority of the platform used by Veroot;
>
> - the Parcellent software platform; and
>
> - the Delivered Manual Induction System (DMIS) software components.

(Ex. A, Doc. 36-1 at 2.)  This was the first time in the almost 13 years that Richman worked for the Veroot Parties that he or Pagefolio claimed that they had any ownership interest in any of the Veroot Parties' intellectual property.

114.    On January 2, 2026, the Veroot Parties initiated this action.

115.    Two weeks later, on January 19, 2026, the Richman Parties unilaterally revoked the Veroot Parties' access to their core company systems including, and not limited to, Veroot's AWS Accounts, EC2 infrastructure, development and deployment tools, VPNs, DNS controls, email servers, and full production databases for various owners, including Andrew, Joe, and other developers.

116.    Without access to these core company systems, the Veroot Parties were unable to perform critical system updates; fix bugs; patch security issues; perform general maintenance; add new features; and deploy enhancements, which in some cases resulted in product failure and stagnation. Further, the Richman Parties' actions posed a serious security risk and exposed the Veroot Parties to competitive harm.

117.    The Richman Parties' actions also prevented Veroot from properly onboarding its new Vice President of Engineering as Richman transitioned out of his role. Further, Veroot was prevented from onboarding new engineers and maintaining access for existing engineers.

118. Veroot was also unable to provision new customer accounts, configure environments, or complete onboarding, resulting in lost revenue and reputational harm.

Richman Deletes Key Data

119. After Richman's departure, the Veroot Parties conducted an investigation of their systems to ensure that Richman did not delete or alter any Veroot or Delivered systems prior to his separation from the companies.

120. The Veroot Parties have already discovered key information Richman and other individuals acting under his direction and control deleted prior to December 24, 2025, the date Pagefolio sent its demand letter.

121. For example, as part of Secureframe's services for Veroot, Secureframe keeps a log of when each Veroot employee participated in certain trainings or agreed to any Veroot policies. Secureframe also maintains a log of any changes to personnel designations (i.e. employee, contractor, etc.).

122. Typically, within Veroot's end-user access to the Secureframe platform, Veroot can view the policies to which an employee agreed and when they agreed:

| Policy | Status |
|---|---|
| Vulnerability and Patch Management Policy | Completed on Jul 22, 2025 |
| Acceptable Use Policy | Completed on Jul 15, 2025 |
| Access Control and Termination Policy | Completed on Jul 15, 2025 |
| Change Management Policy | Completed on Jul 15, 2025 |
| Code of Conduct | Completed on Jul 15, 2025 |
| Configuration and Asset Management Policy | Completed on Jul 15, 2025 |
| Data Classification Policy | Completed on Jul 15, 2025 |
| Information Security Policy | Completed on Jul 15, 2025 |
| Internal Control Policy | Completed on Jul 15, 2025 |
| ISMS Communications Policy | Completed on Jul 15, 2025 |
| ISMS Corrective Actions Policy | Completed on Jul 15, 2025 |
| ISMS Monitoring and Measuring Policy | Completed on Jul 15, 2025 |
| ISMS Scope | Completed on Jul 15, 2025 |
| Network Security Policy | Completed on Jul 15, 2025 |
| Risk Assessment and Treatment Policy | Completed on Jul 15, 2025 |
| Secure Development Policy | Completed on Jul 15, 2025 |
| Security Incident Response Plan | Completed on Jul 15, 2025 |
| Vendor Management Policy | Completed on Jul 15, 2025 |
| Veroot Incident Response Plan | Completed on Jul 15, 2025 |
| Documentation and Access Control for Demo and Test Accounts | Completed on May 5, 2025 |
| Veroot Internal NDA Agreement | Completed on Feb 10, 2025 |

-26-

(**EXHIBIT F**, a true and accurate screenshot of Veroot's end-user access to Secureframe.)

123.    Secureframe records confirmed that, because they were in the Secureframe system as employees, Richman, Wilson, Blue, and Bandala agreed to all relevant Veroot policies through the Secureframe platform.

124.    However, in January 2026, when Veroot accessed its Secureframe platform for these employees, the policies were missing and the classification had been changed from "employee" to "contractor":



(**EXHIBIT G**, Doc. 36-7, a true and accurate screenshot of Veroot's end- user access to Arin Blue's personnel page on Secureframe.)

125.    Veroot contacted Secureframe about this discrepancy. When Secureframe reviewed its change logs, it discovered that on October 21, 2025, Richman, using his associated administrator user account leigh@veroot.com, made manual overrides to his profile and others, changing their designation from employee to contractor:

-27-

(**EXHIBIT H**, Doc. 36-8, a true and accurate screenshot of Secureframe's Audit Log for Richman's October 21, 2025 change to the Secureframe system.)

126.    As result, Richman facilitated the deletion of records showing that he and others had assented to Veroot's policies, including the Internal NDA Agreement.

127.    Veroot also owned and maintained a GitHub repository which is a history of all code and all code changes made to Veroot's codebase. This included a full history of system changes going all the way back to 2011 and included all code written from the very beginning of Veroot.   This code repository was the authoritative record of all proprietary source code, algorithms and technical architecture, product features and iterations, trade secrets, and who authored the code. The history in this repository can be used to prove who created what, establish ownership in disputes, defend trade secret claims, handle contractor/employee IP challenges and it represents core intellectual property (IP) for software companies such as Veroot.

128.    In its investigation, Veroot discovered that on October 23, 2025—two days after Richman deleted the Secureframe policies—Richman, upon information and belief, imaged Veroot's codebase repository and then deleted the repository, removing Veroot's access to all the critical company information and property included in the GitHub repository:



(**EXHIBIT I**, Doc 36-9, a true and accurate screenshot of a log showing that Richman deleted the text file of Veroot's historical codebase on October 23, 2025.)

129.    Richman deleted this codebase repository because it shows that the vast majority of Veroot's IP had already been developed before Richman ever worked for Veroot, including, but not limited to, the core system, logic, foundational architecture, and product work.

130.    Accordingly, the Veroot Parties have already uncovered the following instances of Mr. Richman's misappropriation and mishandling of documents and information belonging solely to the Veroot Parties: (i) copying and imaging Veroot's historical code repositories; (ii) deleting audit trails and historical development logs demonstrating Veroot's authorship; (iii) altering employee classifications and policy acknowledgements to conceal express IP transfers and confidentiality obligations; (iv) retaining administrative credentials and privileged system control after departure; (v) revoking the Veroot Parties' access to their own AWS Account infrastructure and production systems; (vi) leveraging his possession of the Veroot Parties' trade secrets to assert false ownership claims; and (vii) disclosing protected source code and system architecture to the U.S. Copyright Office in support of fraudulent copyright registrations.

131.    Based on these actions, the Veroot Parties are concerned that Richman has spoliated other evidence.  The Veroot Parties' investigation is ongoing.

Richman and Pagefolio Register Invalid Copyrights

132.    To stop the Richman Parties' continued unauthorized use of their intellectual property, the Veroot Parties filed a Motion for a Temporary Restraining Order and Preliminary Injunction on January 23, 2026.

133.    Upon information and belief, that same day, Richman, through Pagefolio, filed three copyright applications in the U.S. Copyright Office for three different computer software

systems belonging to the Veroot Parties: the Veroot Platform, Parcellent, and DMIS.

134. Upon information and belief, these applications contained inaccurate or omitted information. For example, they stated that Pagefolio was the author of each of the systems, that they were completed in 2026, that their first date of publication was January 2, 2026, and that the nation of first publication was Canada. These systems were created years prior in the United States. Further, the applications omitted any reference to the employer-employee relationship between the Veroot Parties and Richman/Pagefolio.

135. The Richman Parties knew that their application contained inaccurate information. Nevertheless, the Richman Parties willfully and deliberately included these inaccuracies.

136. On January 26, 2026, the U.S. Copyright Office approved the Richman Parties' registration of copyrights on the Veroot Platform, Parcellent, and DMIS registration nos. TX0009557778, TXu002521843, and TXu002522066.

137. Upon information and belief, the U.S. Copyright Office relied on those misrepresentations in granting Pagefolio the requested copyrights.

138. Upon information and belief, if it had known about those inaccuracies, the U.S. Copyright Office would have refused the registration.

## COUNT I
### (Declaratory Judgment – IP Ownership - Against Pagefolio and Richman)

139. The Veroot Parties incorporate by reference each of the allegations and averments above as if fully rewritten in this Paragraph.

140. Under 28 U.S.C. § 2201(a), the Veroot Parties are entitled to a declaration that they are the sole owners of the Veroot and Delivered intellectual property over which the Richman Parties' claim ownership, including, but not limited to, the intellectual property referenced in the December 24 Letter.

141.    An actual case or controversy has arisen between the parties, including without limitation that the Richman Parties allege via the December 24 Letter that they have an ownership interest in some or all of the Veroot Parties' intellectual property.

142.    As a result of the December 24 Letter, the Veroot Parties are entitled to a declaration that they are the sole owners of the respective intellectual properties at issue.

143.    Also as a result of the December 24 Letter, the Veroot Parties are entitled to a declaration that the Richman Parties shall cease claiming ownership over any of the Veroot Parties' intellectual property.

## COUNT II
**(Declaratory Judgment – Copyright Invalidity – Against Pagefolio and Richman)**

144.    The Veroot Parties incorporate by reference each of the allegations and averments above as if fully rewritten in this Paragraph.

145.    Under 28 U.S.C. § 2201(a), the Veroot Parties are entitled to a declaration that Pagefolio's copyrights for the Veroot Platform, Parcellent, and DMIS registration nos. TX0009557778, TXu002521843, and TXu002522066 are invalid because they contain inaccurate information.

146.    An actual case or controversy has arisen between the parties, including whether Pagefolio's copyrights on the Veroot Platform, Parcellent, and DMIS are valid.

147.    To prevent the Richman Parties' continued unauthorized use of their intellectual property, the Veroot Parties filed a Motion for a Temporary Restraining Order and Preliminary Injunction on January 23, 2026.

148.    That same day, Richman, through Pagefolio, filed three copyright applications with the U.S. Copyright Office for copyrights on three different computer software systems belonging to the Veroot Parties: the Veroot Platform, Parcellent, and DMIS.

-31-

149.    These applications contained inaccurate or omitted information. For example, they stated that Pagefolio was the author of the each of the systems, that they were completed in 2026, that their first date of publication was January 2, 2026, and that the nation of first publication was Canada. These systems were created years prior in the United States. Further, the applications omitted any reference to the employer-employee relationship between the Veroot Parties and Richman/Pagefolio.

150.    The Richman Parties knew that their application contained inaccurate information.

151.    On January 26, 2026, the U.S. Copyright Office approved the Richman Parties' registration of copyrights on the Veroot Platform, Parcellent, and DMIS registration nos. TX0009557778, TXu002521843, and TXu002522066.

152.    If it had known about those inaccuracies, the U.S. Copyright Office would have refused the registration.

153.    As a result of the Richman Parties' actions, the Veroot Parties are entitled to a declaration that Pagefolio's copyrights, registration nos. TX0009557778, TXu002521843, and TXu002522066, are invalid.

**COUNT III**
**(Declaratory Judgment – Fraud on the U.S. Copyright Office – Against Pagefolio and Richman)**

154.    The Veroot Parties incorporate by reference each of the allegations and averments above as if fully rewritten in this Paragraph.

155.    Under 28 U.S.C. § 2201(a), the Veroot Parties are entitled to a declaration that the Richman Parties' filing of invalid copyrights for the Veroot Platform, Parcellent, and DMIS, registration nos. TX0009557778, TXu002521843, and TXu002522066, constituted fraud on the U.S. Copyright Office.

156. An actual case or controversy has arisen between the parties, including whether the Richman Parties' filing of invalid copyrights on the Veroot Platform, Parcellent, and DMIS with the U.S. Copyright Office constitutes fraud.

157. To prevent the Richman Parties' continued unauthorized use of their intellectual property, the Veroot Parties filed a Motion for a Temporary Restraining Order and Preliminary Injunction on January 23, 2026.

158. That same day, Richman, through Pagefolio, filed three copyright applications with the U.S. Copyright Office for copyrights on three different computer software systems belonging to the Veroot Parties: the Veroot Platform, Parcellent, and DMIS.

159. These applications contained inaccurate or omitted information. For example, they stated that Pagefolio was the author of the each of the systems, that they were completed in 2026, that their first date of publication was January 2, 2026, and that the nation of first publication was Canada. These systems were created years prior in the United States. Further, the applications omitted any reference to the employer-employee relationship between the Veroot Parties and Richman/Pagefolio.

160. The Richman Parties knew that their applications contained inaccurate information. The Richman Parties willfully and deliberately included these inaccuracies.

161. On January 26, 2026, the U.S. Copyright Office approved the Richman Parties' registration of copyrights on the Veroot Platform, Parcellent, and DMIS registration nos. TX0009557778, TXu002521843, and TXu002522066.

162. Upon information and belief, the U.S. Copyright Office relied on those misrepresentations in granting Pagefolio the requested copyrights.

163. If it had known about those inaccuracies, the U.S. Copyright Office would have refused the registration.

164. As a result of the Richman Parties' actions, the Veroot Parties are entitled to a declaration that the Richman Parties' filing of invalid copyrights for the Veroot Platform, Parcellent, and DMIS, registration nos. TX0009557778, TXu002521843, and TXu002522066, constituted fraud on the U.S. Copyright Office.

## COUNT IV
### (Fraud – Against Richman)

165. The Veroot Parties incorporate by reference each of the allegations and averments above as if fully rewritten in this Paragraph.

166. On July 31, 2025, after expressing disagreement with certain business decisions, Richman told the Veroot Parties that he wanted to sever ties by the end of 2025.  He claimed that he would ensure a professional transition and assist in resolving outstanding matters. Again, Richman never claimed that he had any ownership interest in any of the Veroot Parties' intellectual property.

167. With respect to his comment that he would "resolve outstanding matters," Richman later confirmed that this related to what were, in his opinion, complicated legal questions to resolve regarding the Veroot Parties' code.  But Richman never disclosed to the Veroot Parties at that time that he thought the parties had complicated legal questions to resolve.

168. At the January 30, 2026 hearing, Richman confirmed that on or around July 31, 2025, he planned to retain legal counsel regarding those "complicated legal questions":

Q     And then that last little bit you say, you just -- you don't give a definition of "outstanding matters."  What did you mean by "outstanding matters"?

A     I understood that we had some very complicated legal questions to resolve with regard to the code, but I needed advice, and so I needed to seek that advice before I commented on it.

Q     And did you retain legal counsel for that advice?

A     I did.

(Ex. B, Doc. 36-2, Hearing Transcript at 189:4–12.)

169.    Accordingly, as early as July 31, 2025, Richman viewed himself and Pagefolio as legally adverse to the Veroot Parties.

170.    Despite this, Richman failed to disclose that to the Veroot Parties.

171.    Further, while continuing to work for the Veroot Parties, Richman began taking steps to misappropriate the Veroot Parties' property without ever informing the Veroot Parties that he believed he owned the Veroot Parties' IP.

172.    After Richman's departure, the Veroot Parties conducted an investigation of their systems to ensure that Richman did not delete or alter any Veroot or Delivered systems prior to his separation from the companies. The Veroot Parties' investigation found that Richman did, in fact, delete key Veroot and Delivered information.

173.    On October 21, 2025, Richman, using his associated user account leigh@veroot.com, made manual overrides to his Secureframe profile and others, changing their designation from employee to contractor. (Ex. H, Doc. 36-8.)

174. As result, Richman facilitated the deletion of records showing that he and others had assented to Veroot's policies, including the Internal NDA Agreement.

175. Veroot also maintained a history of all changes made to Veroot's codebase. This included a full text file history of system changes going all the way back to 2011 and the beginning of Veroot.

176. In its investigation, Veroot discovered that on October 23, 2025—two days after Richman deleted the Secureframe policies—Richman imaged Veroot's codebase repository and then deleted it, removing Veroot's access to all that historical information. (Ex. I, Doc. 36-9.)

177. Richman deleted this codebase repository because it shows that the vast majority of Veroot's IP had already been developed before Richman ever worked for Veroot, including, but not limited to, the core system, logic, foundational architecture, and product work.

178. Accordingly, in addition to failing to disclose his false IP ownership claim, the Veroot Parties have already uncovered the following steps the Richman Parties undertook in furtherance of their fraudulent scheme: (i) copying and imaging Veroot's historical code repositories; (ii) deleting audit trails and historical development logs demonstrating Veroot's authorship; (iii) altering employee classifications and policy acknowledgements to conceal express IP transfers and confidentiality obligations; (iv) retaining administrative credentials and privileged system control after departure; (v) revoking the Veroot Parties' access to their own AWS Account infrastructure and production systems; (vi) leveraging his possession of the Veroot Parties' trade secrets to assert false ownership claims; and (vii) disclosing protected source code and system architecture to the U.S. Copyright Office in support of fraudulent copyright registrations.

179. As Veroot and Delivered's CTO, Richman owed a duty to Veroot and Delivered to disclose to both companies that he believed he owned certain Veroot or Delivered IP.

-36-

180.    That duty was material to Richman's continued employment with Veroot and Delivered.

181.    As of July 31, 2025, Richman viewed himself and Pagefolio as legally adverse to the Veroot Parties. However, Richman concealed this fact from the Veroot Parties until December 24, 2025.

182.    Richman took further steps to destroy documentation and evidence showing that the Veroot Parties owned their IP on October 21 and 23, 2025.

183.    Richman intended to mislead Veroot and Delivered into relying on his silence so he could continue working with Veroot and Delivered through the remainder of 2025, essentially to allow Richman to misappropriate the Veroot Parties' IP.

184.    Veroot and Delivered actually relied on Richman's silence. Veroot and Delivered had a right to rely on Richman's silence, as he had a duty to speak otherwise.

185.    Both the Veroot Parties have suffered lost revenue and reputational harm due to Richman's actions.

186.    As a direct and proximate result of Richman's actions, the Veroot Parties have suffered substantial monetary damages in an amount to be proven at trial but believed to be in excess of a million dollars.

## COUNT V
### (Intentional Spoliation of Evidence – Against Richman)

187.    The Veroot Parties incorporate by reference each of the allegations and averments above as if fully rewritten in this Paragraph.

188.    On July 31, 2025, after expressing disagreement with certain business decisions, Richman told the Veroot Parties that he wanted to sever ties by the end of 2025.  He claimed that he would ensure a professional transition and assist in resolving outstanding matters.

-37-

Again, Richman never claimed that he had any ownership interest in any of the Veroot Parties' intellectual property.

189.    With respect to his comment that he would "resolve outstanding matters," Richman later confirmed that this related to what were, in his opinion, complicated legal questions to resolve regarding the Veroot Parties' code.  But Richman never disclosed to the Veroot Parties at that time that he thought the parties had complicated legal questions to resolve.

190.    At the January 30, 2026 hearing, Richman confirmed that on or around July 31, 2025, he planned to retain legal counsel regarding those "complicated legal questions":

```
Q      And then that last little bit you say, you just -- you
don't give a definition of "outstanding matters."  What did
you mean by "outstanding matters"?
A      I understood that we had some very complicated legal
questions to resolve with regard to the code, but I needed
advice, and so I needed to seek that advice before I
commented on it.
Q      And did you retain legal counsel for that advice?
A      I did.
```

(Ex. B, Doc. 36-2, Hearing Transcript at 189:4–12.)

191.    Accordingly, as early as July 31, 2025, Richman viewed himself and Pagefolio as legally adverse to the Veroot Parties.

192.    Because Richman viewed himself and Pagefolio as legally adverse to the Veroot Parties, it was probable that litigation would result between Richman and the Veroot Parties as of July 31, 2025.

193.    Richman himself stated that there were "complicated legal questions" between the parties and that he secured counsel to provide advice on those issues, showing that Richman knew that litigation was probable between Richman and the Veroot Parties.

194.    Further, while continuing to work for the Veroot Parties, Richman began taking steps to misappropriate the Veroot Parties' property without ever informing the Veroot Parties that he believed he owned the Veroot Parties' IP.

195.    After Richman's departure, the Veroot Parties conducted an investigation of their systems to ensure that Richman did not delete or alter any Veroot or Delivered systems prior to his separation from the companies. The Veroot Parties' investigation found that Richman did, in fact, delete key Veroot information.

196.    On October 21, 2025, Richman, using his associated user account leigh@veroot.com, made manual overrides to his Secureframe profile and others, changing their designation from employee to contractor. (Ex. H, Doc. 36-8.)

197.    As result, Richman facilitated the deletion of records showing that he and others had assented to Veroot's policies, including the Internal NDA Agreement.

198.    Veroot also maintained a history of all changes made to Veroot's codebase. This included a full text file history of system changes going all the way back to 2011 and the beginning of Veroot.

199.    In its investigation, Veroot discovered that on October 23, 2025—two days after Richman deleted the Secureframe policies—Richman imaged Veroot's codebase repository and then deleted it, removing Veroot's access to all that historical information. (Ex. I, Doc. 36-9.)

200. Richman deleted this codebase repository because it shows that the vast majority of Veroot's IP had already been developed before Richman ever worked for Veroot, including, but not limited to, the core system, logic, foundational architecture, and product work.

201. Accordingly, the Veroot Parties have already uncovered the following instances of Mr. Richman's misappropriation and mishandling of documents and information belonging solely to the Veroot Parties: (i) copying and imaging Veroot's historical code repositories; (ii) deleting audit trails and historical development logs demonstrating Veroot's authorship; (iii) altering employee classifications and policy acknowledgements to conceal express IP transfers and confidentiality obligations; (iv) retaining administrative credentials and privileged system control after departure; (v) revoking the Veroot Parties' access to their own AWS Account infrastructure and production systems; (vi) leveraging his possession of the Veroot Parties' trade secrets to assert false ownership claims; and (vii) disclosing protected source code and system architecture to the U.S. Copyright Office in support of fraudulent copyright registrations.

202. Richman willfully deleted the Secureframe data as well as Veroot's code history in order to disrupt the Veroot Parties' claims against Richman.

203. Richman's actions have, in fact, disrupted the Veroot Parties' case.

204. Veroot has suffered lost revenue and reputational harm due to Richman's actions.

205. As a direct and proximate result of Richman's actions, the Veroot Parties have suffered substantial monetary damages in an amount to be proven at trial but believed to be in excess of a million dollars.

### COUNT VI
**(Damages Resulting From A Criminal Act – R.C. § 2307.60 – Against Richman)**

206. The Veroot Parties incorporate by reference each of the allegations and averments above as if fully rewritten in this Paragraph.

207. Starting in July 2025, Richman began working against Veroot and Delivered's interests and began taking steps to appropriate the Veroot Parties' property.

208. Richman began to delete data and information showing that the Veroot Parties owned the IP at issue, including documents and information showing he agreed to the Internal NDA Policy, and thus expressly transferred any IP to the Veroot Parties, and a codebase repository showing that the vast majority of Veroot's IP had already been developed before Richman ever worked for Veroot. Richman did not have consent from Veroot to access their computer systems in this manner. Richman knowingly accessed Veroot's systems and deleted their information without consent.

209. Further, on January 19, 2026, Richman unilaterally revoked the Veroot Parties' access to core company systems including, and not limited to, Veroot's AWS Account, EC2 infrastructure, development and deployment tools, VPNs, DNS controls, email servers, and full production databases for various owners including Andrew, Joe, and other developers. Richman did not have consent from Veroot to do this. Richman knowingly disabled Veroot's access to these systems without consent.

210. Richman refused to return access to the Veroot Parties, essentially holding hostage their software and critical information.

211. Without access to these core company systems, the Veroot Parties were unable to perform critical system updates; fix bugs; patch security issues; perform general maintenance; add new features; and deploy enhancements which, in some cases resulted in product failure and stagnation. Further, Richman actions posed a serious security risk and exposed the Veroot Parties to competitive harm.

212. Richman's unauthorized use and access to Veroot's computer systems constitutes a violation of O.R.C. § 2913.04(B)—Ohio's statute criminalizing the unauthorized use of property, including computer systems.

213. During this period, Veroot was unable to provision new customer accounts, configure environments, or complete onboarding.

214. Veroot has suffered lost revenue and reputational harm due to Richman's criminal actions.

215. Therefore, the Veroot Parties may seek recovery under O.R.C. § 2307.60.

216. As a direct and proximate result of Richman's criminal actions, the Veroot Parties have suffered substantial monetary damages in an amount to be proven at trial but believed to be in excess of a million dollars. The Veroot Parties are also entitled to punitive or exemplary damages as well as their costs and attorney's fees.

### COUNT VII
### (Breach of Fiduciary Duty – Against Richman)

217. The Veroot Parties incorporate by reference each of the allegations and averments above as if fully rewritten in this Paragraph.

218. As the CTO of both Veroot and Delivered, Richman owed the Veroot Parties a fiduciary duty including a duty of loyalty.

219. Indeed, Richman admitted during the January 30, 2026 hearing that his relationship with the Veroot Parties was one of "mutual trust."

220. Starting in January 2025, Richman began failing to complete his work on time and missed several important deadlines for both Veroot and Delivered.

221. In July 2025, Richman expressed to the Veroot Parties' owners that he was seeking to amicably transition away from the company. To that end, he proposed a wind down period,

during which he would complete some outstanding projects and then cease employment with Veroot by the end of 2025.

222.    During this time, unbeknownst to the Veroot Parties, Richman actively sought legal counsel to determine what steps he needed to take to claim an ownership interest in the Veroot Parties' IP.

223.    Starting in July 2025, Richman also began working against Veroot and Delivered's interests and began taking steps to appropriate the Veroot Parties' property.

224.    Richman also began to delete data and information showing that the Veroot Parties owned the IP at issue, including documents and information showing he agreed to the Internal NDA Policy, and thus expressly transferred any IP to the Veroot Parties, and a codebase repository showing that the vast majority of Veroot's IP had already been developed before Richman ever worked for Veroot.

225.    Then, on December 24, 2025, *for the first time* in his nearly 13 years of employment with the Veroot Parties, Richman claimed that Pagefolio owns, among other things, "the majority of the platform used by Veroot." (Ex. A, Doc. 36-1.)  Not once in the nearly 13 years he worked for the Veroot Parties did Richman ever claim that he had an ownership interest in any of the Veroot Parties' intellectual property.

226.    If Richman believed that he and Pagefolio owned the Veroot Parties' IP, he had a duty to disclose that to their ownership.  Instead of proceeding in good faith and in the Veroot Parties' best interests, Richman acted in his own self-interest all along. Richman's claim that he solely owns the Veroot Parties' IP, despite never once in his nearly 13 years of employment claiming he owned anything, breached his duty of loyalty to the Veroot Parties.

-43-

227.    Further, on January 19, 2026, Richman unilaterally revoked the Veroot Parties' access to core company systems including, and not limited to, Veroot's AWS Account, EC2 infrastructure, development and deployment tools, VPNs, DNS controls, email servers, and full production databases for various owners including Andrew, Joe, and other developers.

228.    Richman refused to return access to the Veroot Parties, essentially holding hostage their software and critical information.

229.    By revoking the Veroot Parties' access to core company systems, Richman further breached his fiduciary duty of loyalty to the Veroot Parties.

230.    Without access to these core company systems, the Veroot Parties were unable to perform critical system updates; fix bugs; patch security issues; perform general maintenance; add new features; and deploy enhancements which, in some cases resulted in product failure and stagnation. Further, Richman actions posed a serious security risk and exposed the Veroot Parties to competitive harm.

231.    During this period, Veroot was also unable to provision new customer accounts, configure environments, or complete onboarding.

232.    Additionally, the Veroot Parties have discovered that Richman destroyed property of the Veroot Parties establishing that they are the sole owners of their intellectual property. Richman's intentional destruction of evidence in October 2025 further breached the fiduciary duties he owed to the Veroot Parties.

233.    As a result, for the last six months of his employment with Veroot and Delivered, Richman acted as a faithless servant.

234.    Accordingly, at the very least, the Richman Parties should have to disgorge of all amounts paid to Pagefolio during the time period in which Richman was a faithless servant, which

the Veroot Parties believe began at least by July 31, 2025 and lasted until Richman was terminated in January 2026.

235. Both the Veroot Parties have suffered lost revenue and reputational harm due to Richman's actions.

236. As a direct and proximate result of Richman's actions, the Veroot Parties have suffered substantial monetary damages in an amount to be proven at trial but believed to be in excess of a million dollars.

## COUNT VIII
### (Tortious Interference – Against Pagefolio and Richman)

237. The Veroot Parties incorporate by reference each of the allegations and averments above as if fully rewritten in this Paragraph.

238. The Veroot Parties maintain business relationships with many customers in the transportation and logistics industry.

239. Through their work with the Veroot Parties, the Richman Parties were made aware of the Veroot Parties' various business relationships.

240. The Veroot Parties' ability to maintain their business relationships relies on their ability to access and maintain the Veroot Platform and other systems through which they manage their businesses.

241. On January 19, 2026, the Richman Parties unilaterally revoked the Veroot Parties' access to core company systems including, and not limited to, Veroot's AWS Account, EC2 infrastructure, development and deployment tools, VPNs, DNS controls, email servers, and full production databases for various owners including Andrew, Joe, and other developers.

242. Without access to these core company systems, the Veroot Parties were unable to perform critical system updates; fix bugs; patch security issues; perform general maintenance; add

-45-

new features; and deploy enhancements which, in some cases resulted in product failure and stagnation. Further, the Richman Parties' actions posed a serious security risk and exposed the Veroot Parties to competitive harm.

243.    As a result, the Veroot Parties were prevented from fully serving their customers while the Richman Parties withheld access to their company systems.

244.    The Richman Parties' actions interfered with the Veroot Parties' business relationships with their customers.

245.    The Richman Parties intentionally and materially interfered with the Veroot Parties' business relationships.

246.    The Richman Parties' interference was without justification.

247.    The Richman Parties' interference caused the Veroot Parties to suffer damages in an amount to be proven at trial but believed to be in excess of a million dollars.

## COUNT IX
### (Trade Secret Misappropriation – Federal Defend Trade Secrets Act – Against Richman and Pagefolio)

248.    The Veroot Parties incorporate by reference each of the allegations and averments above as if fully rewritten in this Paragraph.

249.    During the course of his employment with the Veroot Parties, Richman, and by extension Pagefolio, were provided with access to substantial amounts of the Veroot Parties confidential, proprietary, and trade secret information, including the Veroot Platform and Delivered software systems (the "Trade Secrets").

250.    The Veroot Parties' Trade Secrets are not available to the general public and the Veroot Parties closely guard them. The Veroot Parties keep such information strictly confidential in order to maintain a competitive advantage over competitors.

251. The Veroot Parties undertook reasonable measures to ensure that its confidential information and trade secrets remained secret by, among other things, disclosing such information to only those who need the information to perform their Veroot and Delivered job duties, making known to those individuals the fact that the information was to be kept confidential, maintaining reasonable security in and around its place of business, and requiring individual employees to agree to keep it confidential.

252. The Veroot Parties' Trade Secrets are "trade secrets" within the meaning of the Defend Trade Secrets Act, 18 U.S.C. § 1839, because the information is not generally known outside of the Veroot Parties' business, the information is not generally known by employees and others involved in the Veroot Parties' business, the Veroot Parties have taken reasonable measures to guard the secrecy of the information, the information is of great value to the Veroot Parties and their competitors, the Veroot Parties invested significant amounts of time and money in developing the information, the information cannot easily be acquired or duplicated by others, and the Veroot Parties continuously used or use the information in their business.

253. Richman was subject to the Veroot Parties' confidentiality and trade secret obligations and was required to keep the Veroot Parties' Trade Secrets confidential.

254. Additionally, while employed by Veroot and Delivered, Richman was under a duty of loyalty to maintain the confidentiality of the Veroot Parties' Trade Secrets.

255. After he decided to leave the Veroot Parties, Richman continued to owe a duty to the Veroot Parties not to use or disclose to third persons the Veroot Parties' Trade Secrets.

256. Upon information and belief, the Richman Parties continue to use copies of the Veroot Parties' Trade Secrets.

257.    On January 23, 2026, upon information and belief, the Richman Parties disclosed the Veroot Parties' Trade Secrets to the U.S. Copyright Office when they filed various copyright applications for the Veroot Parties' Trade Secret information.

258.    In sum, the Veroot Parties have already uncovered the following instances of Mr. Richman's misappropriation and mishandling of documents and information belonging solely to the Veroot Parties: (i) copying and imaging Veroot's historical code repositories; (ii) deleting audit trails and historical development logs demonstrating Veroot's authorship; (iii) altering employee classifications and policy acknowledgements to conceal express IP transfers and confidentiality obligations; (iv) retaining administrative credentials and privileged system control after departure; (v) revoking the Veroot Parties' access to their own AWS Account infrastructure and production systems; (vi) leveraging his possession of the Veroot Parties' trade secrets to assert false ownership claims; and (vii) disclosing protected source code and system architecture to the U.S. Copyright Office in support of fraudulent copyright registrations.

259.    Unless restrained, the Richman Parties continue to use, divulge, disclose, acquire or otherwise misappropriate the Veroot Parties' Trade Secrets.

260.    Consequently, the Richman Parties' actions constitute the actual or threatened misuse of the Veroot Parties' Trade Secrets.

261.    The Veroot Parties thus request an order requiring the Richman Parties to return any and all of the Veroot Parties' Trade Secrets to the Veroot Parties.

262.    Finally, the Richman Parties' misappropriation of the Veroot Parties' Trade Secrets has been willful and malicious, and the Veroot Parties have incurred significant damage as a result of the Richman Parties' misappropriation in an amount to be proven at trial but believed to be in excess of a million dollars.

263. The Richman Parties' actions have also damaged the Veroot Parties' Trade Secrets, goodwill, reputation, and legitimate business interests.

264. The Veroot Parties are therefore entitled to recover not only compensatory damages, but also punitive damages and attorneys' fees resulting from the Richman Parties' wrongful misappropriation and use of the Veroot Parties' Trade Secrets.

**COUNT X**
**(Trade Secret Misappropriation – Ohio Rev. Code § 1331.61 – Against Richman and Pagefolio)**

265. The Veroot Parties incorporate by reference each of the allegations and averments above as if fully rewritten in this Paragraph.

266. The Veroot Parties' Trade Secrets constitute "trade secrets" as defined by the Ohio Uniform Trade Secrets Act, Ohio Rev. Code § 1331.61, because they derive independent economic value, in part from not being known to the public or other entities and individuals who could obtain economic value from their use or disclosure. The Veroot Parties' Trade Secrets are not generally known outside of the Veroot Parties' business, the information is not generally known by employees and others involved in the Veroot Parties' business, the Veroot Parties have taken reasonable measures to guard the secrecy of the information, the information is of great value to the Veroot Parties and their competitors, the Veroot Parties invested significant amounts of time and money in developing the information, the information cannot easily be acquired or duplicated by others, and the Veroot Parties continuously used and/or uses the information in its business.

267. The Veroot Parties undertook reasonable measures to ensure that their Trade Secrets remained secret by, among other things, disclosing such information to only those who need the information to perform their Veroot and Delivered job duties, making known to those individuals the fact that the information was to be kept confidential, maintaining reasonable

-49-

security in and around their place of business, and requiring individual employees to agree to keep information confidential.

268. Richman was subject to the Veroot Parties confidentiality and trade secret obligations and was required to keep the Veroot Parties' Trade Secrets confidential.

269. Additionally, while employed by the Veroot Parties, Richman was under a duty of loyalty to maintain the confidentiality of the Veroot Parties' Trade Secrets.

270. After he decided to leave the Veroot Parties, Richman continued to owe a duty to the Veroot Parties not to use or disclose to third persons the Veroot Parties' Trade Secrets.

271. Upon information and belief, the Richman Parties continue to use copies of the Veroot Parties' Trade Secrets.

272. On January 23, 2026, upon information and belief, the Richman Parties disclosed the Veroot Parties' Trade Secrets to the U.S. Copyright Office when they filed various copyright applications for the Veroot Parties' Trade Secret information.

273. In sum, the Veroot Parties have already uncovered the following instances of Mr. Richman's misappropriation and mishandling of documents and information belonging solely to the Veroot Parties: (i) copying and imaging Veroot's historical code repositories; (ii) deleting audit trails and historical development logs demonstrating Veroot's authorship; (iii) altering employee classifications and policy acknowledgements to conceal express IP transfers and confidentiality obligations; (iv) retaining administrative credentials and privileged system control after departure; (v) revoking the Veroot Parties' access to their own AWS Account infrastructure and production systems; (vi) leveraging his possession of the Veroot Parties' trade secrets to assert false ownership claims; and (vii) disclosing protected source code and system architecture to the U.S. Copyright Office in support of fraudulent copyright registrations.

274. Unless restrained, the Richman Parties continue to use, divulge, disclose, acquire and/or otherwise misappropriate the Veroot Parties' Trade Secrets.

275. Consequently, the Richman Parties' actions constitute the actual or threatened misuse of the Veroot Parties' Trade Secrets.

276. The Veroot Parties thus request an order requiring Richman and Pagefolio to return any and all of the Veroot Parties' Trade Secrets to the Veroot Parties.

277. Finally, Defendants' misappropriation of the Veroot Parties' Trade Secrets has been willful and malicious, and the Veroot Parties have incurred significant damage as a result of the Richman Parties' misappropriation in an amount to be proven at trial but believed to be in excess of a million dollars.

278. The Richman Parties' actions have also damaged the Veroot Parties' Trade Secrets, goodwill, reputation, and legitimate business interests.

279. The Richman Parties' misappropriation was intentional, knowing, willful, malicious, fraudulent, and oppressive, thereby entitling the Veroot Parties to an award of exemplary damages under Ohio Rev. Code § 1131.61(b).

## COUNT XI
### (Breach of Contract – Against Richman)

280. The Veroot Parties incorporate by reference each of the allegations and averments above as if fully rewritten in this Paragraph.

281. In July 2013, Veroot hired Richman as an employee of Veroot. On or about June 24, 2013, Veroot presented Richman with the Confidentiality Agreement.

282. Section 4(d) of the Confidentiality Agreement states that Veroot owns any copyrightable work Richman solely or jointly authored for Veroot:

-51-

(d)    **<u>Assignment of Company Inventions.</u>** I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title and interest throughout the world in and to any and all Company Inventions. I further acknowledge that all Company Inventions that are made by me (solely or jointly with others) within the scope of and during the period of the Relationship are "works made for hire" (to the greatest extent permitted by applicable law) and are compensated by my salary and any other compensation paid by the Company to me, including without limitation in equity interest in the Company offered to me.. I hereby waive and irrevocably quitclaim to the Company or its designee any and all claims, of any nature whatsoever, that I now have or may hereafter have for infringement of any and all Company Inventions.

(Ex. C, Doc. 36-3.)

283. Specifically, Section 4(d) specifically acknowledged that Richman's salary and other compensation was paid, in part, to compensate Richman for any works produced for Veroot.

284. Section 4(c) of the Confidentiality Agreement defines "Company Invention" as "any and all Inventions that [Richman] may solely or jointly author, discover, develop, conceive, or reduce to practice during the period of the Relationship." (*Id.*)

285. While Richman did not sign the Confidentiality Agreement at that time, he did not formally reject the Confidentiality Agreement or refuse to sign it. Further, Richman began to perform his duties as Veroot's employee, accepting the terms of the Confidentiality Agreement through his performance.

286. In 2025, Richman reaffirmed his assent to the Confidentiality Agreement's terms.

287. As part of Veroot's ISO 27001 compliance process, Veroot's employees were required to acknowledge and agree to certain policies.

288. One of those policies was the Internal NDA Agreement which contains terms identical to those in the Confidentiality Agreement.

289. Richman acknowledged and agreed to the terms of the Internal NDA Agreement on May 27, 2025.

290.    As a result, there was a valid and enforceable contract between Veroot and Richman providing that Richman would receive a salary and compensation in exchange for the work he performed for Veroot and that Veroot owned any works Richman produced as part of his job.

291.    From 2013 through 2025, the Veroot Parties paid Richman a salary and other compensation, which was substantial, for his work for the Veroot Parties.

292.    During this time, Richman never claimed ownership over any Veroot or Delivered systems.

293.    On December 24, 2025, Richman's lawyer sent a letter to the Veroot Parties claiming that Pagefolio owned the following intellectual properties:

> Without attempting to catalogue intellectual property assets in this letter, Pagefolio's position is that it owns, among other things:
>
> - the majority of the platform used by Veroot;
> - the Parcellent software platform; and
> - the Delivered Manual Induction System (DMIS) software components.

(Ex. A, Doc. 36-1 at 2.)

294.    On January 19, 2026, Richman unilaterally revoked the Veroot Parties' access to core company systems including, and not limited to, Veroot's AWS Account, EC2 infrastructure, development and deployment tools, VPNs, DNS controls, email servers, and full production databases for various owners including Andrew, Joe, and other developers.

295.    Richman refused to return access to the Veroot Parties, essentially holding hostage their software and critical information.

296.    Richman's claim that he owns the Veroot Parties' IP, his unauthorized revocation of the Veroot Parties' access to their core company systems, and his disclosure of the Veroot Parties' confidential information to the U.S. Copyright Office constitutes a breach of the contract between the Veroot Parties and Richman.

297.    As a result of Richman's breach, the Veroot Parties have suffered substantial monetary damages in an amount to be proven at trial but believed to be in excess of a million dollars.

WHEREFORE, Plaintiffs Veroot and Delivered respectfully request that the Court enter judgment against Defendants Pagefolio and Richman as follows:

a.    On Count I, a declaration that:

  i.    Veroot and Delivered are the sole owners of any and all intellectual property used in Veroot's or Delivered's respective businesses over which Pagefolio or Richman claim any ownership interest;

  ii.    Pagefolio and Richman shall cease claiming ownership over any of Veroot's or Delivered's intellectual property; and

  iii.    Pagefolio and Richman shall, in accordance with the terms of the parties' agreement, whether written or oral, transfer to Veroot and Delivered all hardware, software, code, copies of code, emails, documents, logins, passwords, multi-factor authentications, or any other documents or information Pagefolio and Richman used in providing services to Veroot and Delivered.

b.    On Count II, a declaration that Pagefolio's copyrights, registration nos. TX0009557778, TXu002521843, and TXu002522066, are invalid.

c.    On Count III, a declaration that Pagefolio and Richman's filing of invalid copyrights for the Veroot Platform, Parcellent, and DMIS, registration nos. TX0009557778, TXu002521843, and TXu002522066, constituted fraud on the U.S. Copyright Office.

d.    On Count IV through XI, an amount to be proven at trial but believed to be in excess of a million dollars, punitive damages, and attorneys' fees and costs; and

e.    Such other and further relief as this Court may deem just, equitable, or appropriate.

Respectfully submitted,

**BENESCH, FRIEDLANDER, COPLAN &
ARONOFF, LLP**

*/s/ James J. Walsh, Jr.*
James J. Walsh, Jr. (0096660)
Alayna K. Bridgett (0100297)
Jane Wiertel (0106350)
127 Public Square, Suite 4900
Cleveland, OH 44114
Telephone: (216) 363-4500
Facsimile: (216) 363-4588
Email: jwalsh@beneschlaw.com
       abridgett@beneschlaw.com
       jwiertel@beneschlaw.com

*Counsel for Plaintiffs Veroot, LLC and Delivered,
Inc.*

-55-

## JURY DEMAND

Veroot and Delivered hereby demand a trial by the maximum number of jurors allowed by law on all issues so triable in this First Amended Complaint.

*/s/ James J. Walsh, Jr.*

*Counsel for Plaintiffs Veroot, LLC and Delivered, Inc.*

-56-

## CERTIFICATE OF SERVICE

I hereby certify that on February 18, 2026, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system. There are no parties requiring service by other means.

Respectfully submitted,

**BENESCH, FRIEDLANDER, COPLAN & ARONOFF, LLP**

*/s/ James J. Walsh, Jr.*

*Counsel for Plaintiffs Veroot, LLC and Delivered, Inc.*